Slip Op. 12-141

## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Nicholas Tsoucalas, Senior Judge**

DOWNHOLE PIPE & EQUIPMENT LP and  :
DP-MASTER MANUFACTURING CO., LTD.  :
 :
     Plaintiffs,  :
 :
   v.  :   Court No.: 11-00081
 :
UNITED STATES,  :
 :
     Defendant,  :
 :
     and  :
 :
VAM DRILLING USA, TEXAS STEEL  :
CONVERSIONS, INC., ROTARY  :
DRILLING TOOLS, TMK IPSCO, and  :
U.S. STEEL CORP.,  :
 :
     Defendant-Intervenors.  :
_____:

### OPINION and ORDER

**Held:** Plaintiffs' Motion for Judgment on the Agency Record is granted in part because the final determination issued by the Department of Commerce was not supported by substantial evidence and is not in accord with the law as to drill pipe green tube and labor wage rate surrogate values, but is denied in all other respects.

Dated: November 20, 2012

Lehnardt & Lehnardt, LLC, (Mark B. Lehnardt); Chen Law Group, LLC, (Irene H. Chen) for Downhole Pipe & Equipment, LP and DP-Master Manufacturing Co., Ltd., Plaintiffs.

Stuart F. Delery, Acting Assistant Attorney General; Jeanne E. Davidson, Director, Claudia Burke, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Courtney S. McNamara); Office of Chief Counsel for Import Administration, United States Department of Commerce, Nathaniel J. Halvorson, Of Counsel, for the United States, Defendant.

Schagrin Associates, (Roger B. Schagrin, John W. Bohn, and Michael J. Brown) for VAM Drilling USA, Texas Steel Conversions,

Inc., Rotary Drilling Tools, TMK IPSCO; <u>Skadden Arps Slate Meagher</u> <u>& Flom, LLP</u>, (<u>Jeffrey D. Gerrish</u>, <u>Luke A. Meisner</u>, and <u>Robert E.</u> <u>Lighthizer</u>) for United States Steel Corp., Defendant-Intervenors.

    **TSOUCALAS, Senior Judge:** Plaintiffs Downhole Pipe & Equipment, LP, and DP-Master Manufacturing Co., Ltd. ("Downhole" and "DP-Master," respectively, and "DP," collectively) move pursuant to USCIT Rule 56.2 for judgment upon the agency record challenging the determination of the International Trade Administration of the United States Department of Commerce ("Commerce") in <u>Drill Pipe</u> <u>From the People's Republic of China ("PRC")</u>, 76 Fed. Reg. 1,966 (Jan. 11, 2011) ("<u>Final Determination</u>"). VAM Drilling USA, Inc., Rotary Drilling Tools, Texas Steel Conversions Services, Inc., United States Steel Corp., (collectively, "defendant-intervenors"), and Commerce oppose DP's motion.

**BACKGROUND**

    On December 30, 2009, VAM Drilling USA, Inc., TMK IPSCO, Texas Conversion Services, Inc., Rotary Drill Tools, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Works International Union, AFL-CIO, CLC (collectively, "petitioners" or "domestic industry") filed petitions with Commerce seeking the imposition of antidumping and countervailing duties on drill pipe from the PRC. Letter from Roger B. Schagrin to the Secretary of Commerce, Re: Petitions for the Imposition of Antidumping and Countervailing Duties: Drill Pipe

From the PRC, Public Rec. 1 at 1-4.[1]  The parties do not dispute that drill pipe is a specialized high-strength iron alloy tube manufactured in three phases.  "First, seamless tubes — called 'green tubes' — are produced from raw steel."  Pls.' Am. Mem. Supp. Mot. J. Agency R. ("Pls.' Br.") at 3-4.  Second, a manufacturer uses complex and expensive processes to "upset" and heat treat green tube so as to thicken the ends and increase the yield strength to the desired American Petroleum Institute ("API") grade. Id. at 3-6.  Raw green tube can be processed into "oil country tubular goods" ("OCTG") — tubular products other than drill pipe, such as casing and finished tubing — as well, but the parties dispute the interchangeability of drill pipe green tube and OCTG green tube. See Pls.' Br. at 32-33; Def.'s Mem. Opp'n Pls.' Br. ("Def.'s Br.") at 11-15.  Lastly, a manufacturer friction-welds a specialized "tool joint" to the ends of the heat-treated and upset tube to complete the drill pipe.  Id. at 3, 7-8.  A manufacturer may also apply a protective coating or other post-production enhancements to the drill pipe.  See Pls.' Br. at 30-31, 35-36.

DP-Master purchases raw green tubes that it upsets and heat-treats to desired API specifications.  DP-Master manufactures some, but not all, of its tool joints in-house and friction-welds them to

---

[1] Hereinafter all documents in the public record will be designated "PR" and all documents in the confidential record designated "CR" without further specification except where relevant.

the upset and heat-treated green tubes.  DP-Master uses an unaffiliated third party subcontractor — referred to in these proceedings as a "toller" — to apply a protective phosphate coating to its completed drill pipes.  DP-Master sells finished drill pipe and other goods directly to companies in the U.S.  PR 62 at A-5 to A-6, A-26 to A-27, Ex. A-19; PR 107 at D-5 to D-6.

Domestic industry proposed a broad scope for the antidumping and countervailing duty investigations: "[D]rill pipe . . . whether or not conforming to [API] or non-API specifications, whether finished (with or without tool joints attached) or unfinished (including green tubes), and without regard to the specific chemistry of the steel . . . [and excluding] tool joints not attached to drill pipe."  PR 1 at 7.  In its comments from January 15, 2010 and its comments from January 19, 2010, DP-Master argued that the proposed scope overlapped with an existing investigation into OCTG from China.  PR 14 at 2-5; PR 19 at 1-4.  Commerce and domestic industry then agreed on revised scope language, which among other changes included a new exception: "The scope does not include . . . unfinished tubes for casing or tubing covered by any other antidumping or countervailing duty order."  PR 20 at 2. Commerce initiated the investigation based on industry support calculated using the revised scope.  Drill Pipe from the PRC: Initiation of Antidumping Duty Investigation, 75 Fed. Reg. 4,531 (Jan. 28, 2010) ("Initiation").

During the investigation, Commerce directed parties to report factor of production data using "actual quantities consumed to produce the merchandise under investigation." PR 53 at D-2. In the event that a party could not provide such information, it was to "provide a detailed explanation of all efforts undertaken to report the actual quantity of each [factor of production] consumed to produce the merchandise." Id. DP-Master notified Commerce that it was having difficulty obtaining the requested factor of production information from its phosphate toller. PR 107 at D-5 to D-6; PR 115 at 6. Nevertheless, once it did report what limited factor of production data it could obtain from its toller, DP-Master did not reveal that it had actually provided data based on purchased quantities instead of actual quantities consumed. Drill Pipe from the PRC: Issues and Decision Memorandum for the Final Determination (Jan. 3, 2011), PR 258 at 45 ("I&D Memorandum").

In Drill Pipe from the PRC: Preliminary Determination of Sales at Less than Fair Value and Affirmative Determination of Critical Circumstances, and Postponement of Final Determination, 75 Fed. Reg. 51,004 (Aug. 18, 2010) ("Preliminary Determination"),[2]

---

[2] Commerce published corrections to the Preliminary Determination to address a ministerial error concerning Baoshan Iron and Steel Co., a respondent below not participating in the present action. Drill Pipe from the PRC: Notice of Correction to the Preliminary Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, and Postponement of Final Determination, 75 Fed. Reg. 51,014 (Aug. 18, 2010).

Commerce found that DP-Master was selling drill pipe in the U.S. at less than fair value.  Commerce selected India as the primary surrogate country, and used Indian data to calculate surrogate values for two key drill pipe inputs relevant to this case.  First, Commerce calculated a surrogate value for green tube by averaging listings for prices and offers for J/K-55 grade tube, a finished product similar to green tube, from the January and March 2009 issues of "Metal Bulletin Research" ("MBR").  PR 186 at 7.  Second, Commerce established a surrogate value for the tool joints that DP-Master purchased using average unit values of imports under Indian Harmonized Tariff Schedule ("IHTS") category 8431.43.90.[3]  _Id._ Commerce maintained the _Initiation_ scope over DP-Master's objections, but, given "concerns regarding the imprecision of the definition of 'green tubes suitable for drill pipe,'" Commerce declared that it would remove green tube from the scope unless a more definite physical distinction between drill pipe green tube and OCTG green tube emerged in future submissions.  PR 187 at 8.

In the _Preliminary Determination_, Commerce also found that DP-Master was "unable to obtain" certain data from its phosphate toller.  _Id._ at 28.  To fill gaps in the data, DP-Master offered "estimated [factors of production] based on [its] knowledge of the

---

[3] Commerce calculated average unit values from IHTS categories using the Global Trade Atlas, which is published by Global Trade Information Services, Inc.  Global Trade Information Services compiles information it receives directly from the Indian Ministry of Commerce.  PR 186 at 2.

production process," which Commerce found to be "a reasonable proxy to account for the production costs associated with [DP-Master's] . . . tolled merchandise." Id. When Commerce sought to verify the information DP-Master did obtain and report, however, it discovered "for the first time" that DP-Master did not report quantities in the manner Commerce requested, and that DP-Master could not provide records necessary for verification. I&D Memorandum at 45-47.

    Following verification and the final comment period, Commerce issued the Final Determination, six aspects of which are presently on appeal. First, Commerce narrowed the scope by adding three physical criteria to the description of subject green tube. Second, in calculating DP-Master's surrogate financial ratio, Commerce elected to use financial information solely from the Indian company Oil Country Tubular, Ltd. Third, contrary to its finding in the Preliminary Determination, Commerce determined that the average unit value of imports under IHTS categories 7304.29 and 7304.23 was the best available surrogate value for drill pipe green tube. Fourth, at DP-Master's urging, Commerce abandoned IHTS category 8431.43.90 and instead used the same surrogate value it chose for the tool joints DP-Master produced in-house to calculate the surrogate value for the tool joints DP-Master purchased. Without prompting from DP-Master, however, Commerce multiplied the in-house tool joint surrogate value by the applicable financial ratio to account for the selling, general and administration

expenses ("SG&A"), profit, and overhead that would be reflected in prices offered on the open market. Fifth, Commerce calculated the surrogate value for labor by averaging rates in all countries that produced subject goods, regardless of how much each country actually produced. Lastly, Commerce found that DP-Master's failures with respect to reporting its phosphate toller's factor of production data warranted the application of facts otherwise available and an adverse inference therefrom. I&D Memorandum at 10-12, 14-22, 24-32, 44-47.

Subsequent to the filing of this action, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") held that the simultaneous application of nonmarket methodology and countervailing duty law was contrary to the Tariff Act of 1930. GPX Int'l Tire Corp. v. United States, 666 F.3d 732 (Fed. Cir. 2011), superseded by statute, Application of Countervailing Duty Provisions to Nonmarket Economy Countries, Pub. L. No. 112-99, 126 Stat. 265 (effective Mar. 13, 2012). Commerce also issued a countervailing duty order against DP-Master below. Drill Pipe from the PRC: Countervailing Duty Order, 76 Fed. Reg. 11,758 (Mar. 3, 2011) ("Countervailing Duty Order").

### JURISDICTION and STANDARD OF REVIEW

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) and section 516A(a)(2)(B)(iii) of the Tariff Act

of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006).[4]
Additionally, the court will uphold Commerce's determinations in
administrative reviews unless they are "unsupported by substantial
evidence on the record, or otherwise not in accordance with the
law."  19 U.S.C. § 1516a(b)(1)(B)(I).

## DISCUSSION

DP argues that the Final Determination is contrary to law and
unsupported by the record with respect to: scope; surrogate
financial ratio; surrogate values for drill pipe green tube,
purchased tool joints, and labor; and the partial application of
adverse facts available.   DP also challenges the Final
Determination as contrary to law on the basis that it is being
applied simultaneously with the Countervailing Duty Order.  See GPX
Int'l Tire Corp., 666 F.3d at 737.  For the reasons outlined below,
the Final Determination is affirmed in all respects except with
regard to the surrogate values for drill pipe green tube and labor.

## I. Scope

DP argues that "the record lacks substantial evidence to
support Commerce's three criteria for including green tube within
the scope" of the Final Determination[5] because some green tube

_____

[4] All further citations to the Tariff Act of 1930 are to the
relevant provisions of Title 19 of the United States Code, 2006
edition, and all applicable supplements thereto.

[5] The scope of the Final Determination covers:
unfinished drill collars (including all drill collar
green tubes) and unfinished drill pipe (including drill

fitting its criteria are also subject to antidumping and countervailing duty orders on OCTG.[6]  Pls.' Br. at 32; see OCTG from the PRC, 75 Fed. Reg. 28,551 (May 21, 2010) (antidumping duty order); OCTG from the PRC, 75 Fed. Reg. 3,203 (Jan. 20, 2010) (countervailing duty order).  DP-Master does not export green tube to the U.S., and neither it nor any party below have requested a scope determination pursuant to 19 C.F.R. § 351.225 (2012).  Instead, DP requests that "this Court . . . remand to Commerce to exclude green tube from the scope of the orders, to recalculate industry support, and to revoke the AD and CVD orders if industry support is lacking." Pls.' Br. at 33.  Because DP seeks remand to reassess an industry support figure calculated using the Initiation scope based on a purported deficiency in the Final Determination scope, its challenge turns on whether modifying the scope during the course of an antidumping investigation requires Commerce to

---

        pipe green tubes, which are tubes meeting the following
        description: seamless tubes with an outer diameter of
        less than or equal to 6 5/8 inches[,] . . . containing
        between 0.16 and 0.75 percent molybdenum, and containing
        between 0.75 and 1.45 percent chromium).  The scope does
        not include tool joints not attached to the drill pipe,
        nor does it include unfinished tubes for casing or tubing
        covered by any other antidumping or countervailing duty
        order.
Final Determination, 76 Fed. Reg. at 1967.

        [6] DP identifies "P-110" as a finished OCTG product made from
green tube that is seamless, can have an outside diameter of less
than 6 5/8 inches, and is typically (though not required to be
under API standards) alloyed with molybdenum and chromium within
the parameters of the Final Determination.  See Pls.' Br. at 32; CR
103 at 33-34, 45.

recalculate industry support.

To initiate an antidumping duty investigation, Commerce must "determine that the petition has been filed by or on behalf of an industry." 19 U.S.C. § 1673a(c)(1)(A)(ii). The Act requires Commerce to complete the industry support determination within twenty days of the filing of a petition. Id. § 1673a(c)(1)(A). Although interested parties may comment in the interim, "[i]t is for Commerce to determine whether those requirements have been met, and [it] has broad discretion in reaching its decision." Minebea Co. v. United States, 16 CIT 20, 21, 782 F. Supp. 117, 119 (1992), aff'd, 984 F.2d 1178 (Fed. Cir. 1993); see Gulf States Tube Div. of Quanex Corp. v. United States, 21 CIT 1013, 1015–19, 981 F. Supp. 630, 634–38 (1997). "After [Commerce] makes a determination with respect to initiating an investigation, the determination regarding industry support shall not be reconsidered." 19 U.S.C. § 1673a(c)(4)(E). In other words, "Commerce is prohibited from reconsidering industry support after the initiation of an investigation." P.T. Pindo Deli Pulp & Paper Mills v. United States, 36 CIT   ,   , 825 F. Supp. 2d 1310, 1323 (2012) (citing 19 U.S.C. § 1673a(c)(4)(E)); see Yantai Xinke Steel Structure Co. v. United States, 36 CIT   ,   , Slip Op. 12-95, at 11 (July 18, 2012) ("[R]equiring [Commerce] to examine record evidence in addition to that contained in the petition in no way disturbs the 'finality' of its decision to initiate an investigation.").

DP's sole argument — that some green tube used to produce OCTG meet the technical specifications of the <u>Final Determination</u> and are thus subject to two antidumping orders — has little bearing on Commerce's decision to initiate the investigation. 19 U.S.C. § 1673a(c)(4)(E). In fact, DP-Master conceded below that <u>Initiation</u> scope, "distinguishing green tube by end-use, <u>might have remedied the overlap</u> if it had been published before the OCTG investigation was initiated."[7]   PR 33 at 3 (emphasis added).   The <u>Final Determination</u> scope contains the same end-use distinction as the <u>Initiation</u>, but DP does not analyze the purported overlap in light of this potentially remedial exception. <u>See</u> Pls.' Br. at 32–33. Because Commerce is "prohibited" from reevaluating industry support during the course of an investigation regardless of whether the scope is modified, <u>see</u> <u>P.T. Pindo Deli Pulp</u>, 36 CIT at   , 825 F. Supp. 2d at 1323, and because DP does not challenge the <u>Initiation</u> scope here, DP's request for remand to reevaluate industry support must be denied.

Even if DP's challenge were procedurally appropriate, it would fail on a substantive basis. <u>See</u> <u>id.</u> at   , 825 F. Supp. 2d at 1323 (prohibition against Commerce from reconsidering industry

---

[7] Commerce initiated the OCTG investigation well before it settled on the revised scope language to initiate the present investigation. <u>See</u> <u>OCTG from the PRC</u>, 74 Fed. Reg. 20,706 (May 5, 2009) (initiation notice).   DP-Master may actually have been referring to the publication of the countervailing duty order on OCTG from the PRC. <u>Compare</u> PR 20 at 1–2, <u>with</u> <u>OCTG from the PRC</u>, 75 Fed. Reg. 3,203 (Jan. 20, 2010) (countervailing duty order).

support "does not limit" the court's power to review it).

"Commerce owes deference to the intent of the proposed scope of an

antidumping investigation as expressed in an antidumping petition,"

Ad Hoc Shrimp Trade Action Comm. v. United States, 33 CIT   ,   ,

637 F. Supp. 2d 1166, 1174-75 (2009), and Commerce properly

identified domestic industry's intent to investigate drill pipe

green tube.  In the Initiation, Commerce observed that it was

"clear throughout Petitioners' submissions that their use of the

term 'drill pipe' includes 'green tubes' for drill pipe production

only," not green tubes for OCTG production.  PR 22, Att. II at 8.

In supplements to the petition, domestic industry described how the

OCTG and drill string channels of distribution are distinct and

that "the companies that process green tubes into finished drill

pipe intimately know the few producers of the appropriate green

tube." PR 7 at 5-6.  Domestic industry also provided three prior

International Trade Commission determinations describing why

technical specifications and customer expectations led it to treat

green tube for drill pipe as a "distinct like product" from green

tube for OCTG.  Id. Ex. 1 (excerpts from OCTG from Argentina,

Austria, Italy, Japan, Korea, Mexico, and Spain, USITC Pub. 2911,

Inv. Nos. 701-TA-363 and 701-TA-364 and 731-TA-711-717 (1995)

(investigation notice), OCTG from Argentina, Italy, Japan, Korea

and Mexico, USITC Pub. 3434, Inv. Nos. 701-TA-364 and 731-TA-711

and 731-TA-713-716(June 2001) (first sunset review), and OCTG from

Argentina, Italy, Japan, Korea, and Mexico, USITC Pub. 3923, Inv.
Nos. 731-TA-711 and 731-TA-713-716 (June 2007) (second sunset
review)). Given the end-use exception and the extensive evidence
showing a distinction in channels of distribution, customer
expectations, and technical specifications, it would not be
appropriate for this court to usurp Commerce's exercise of
discretion in defining the scope of the Initiation. See Ad Hoc
Shrimp Trade, 33 CIT at   , 637 F. Supp. 2d at 1174-75. A thorough
review of the record reveals that Commerce properly determined that
the petition met the support threshold required to commence the
investigation, CR 15 Att. 2; PR 22 Att. 2, and as such, DP's
request must be denied.

## II. Surrogate Values

"Commerce ordinarily determines the normal value of subject
merchandise of an exporter or producer from a nonmarket economy .
. . country 'on the basis of the value of the factors of production
utilized in producing the merchandise.'" Shantou Red Garden
Foodstuff Co. v. United States, 36 CIT   ,   , 815 F. Supp. 2d
1311, 1316 (2012) (quoting 19 U.S.C. § 1677b(c)(1)). This
procedure seeks "to assess the 'price or costs' of factors of
production" of subject merchandise in a comparable market economy
"in an attempt to construct a hypothetical market value of that
product" in the nonmarket economy. Nation Ford Chem. Co. v. United
States, 166 F.3d 1373, 1375 (Fed. Cir. 1999). Because "the process

of constructing foreign market value for a producer in a nonmarket country is difficult and necessarily imprecise," id. at 1377 (quoting Sigma Corp. v. United States, 117 F.3d 1401, 1407 (Fed. Cir. 1997)), Commerce must use the "best available information" to select surrogate prices for each factor of production.  19 U.S.C. § 1677b(c)(4).  Commerce "normally will use publically available information to value factors," 19 C.F.R. § 351.408(c)(1), and it prefers to use information "reflect[ing] a broad market average," "contemporaneous with the period of review," "specific to the input in question," and "exclusive of taxes on exports."  Fuwei Films (Shandong) Co. v. United States, 36 CIT   ,   , 837 F. Supp. 2d 1347, 1350-51 (2012).

     In evaluating Commerce's selection of the best available surrogate value under the substantial evidence standard, "[t]he Court's role is not to make that determination anew, but rather to decide 'whether a reasonable mind could conclude that Commerce chose the best available information.'"  China First Pencil Co. v. United States, 34 CIT   ,   , 721 F. Supp 2d 1369, 1375 (2010) (quoting QVD Food Co. v. United States, 34 CIT   ,   , 721 F. Supp. 2d 1311, 1315 (2010), aff'd, 658 F.3d 1318 (Fed. Cir. 2011)).  It is critical that Commerce's selection "establishes the antidumping margins as accurately as possible."  Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quoting Shakeproof Assembly Components v. United States, 268 F.3d 1376,

1382 (Fed. Cir. 2001)). Nevertheless, Commerce has "broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006) (quoting Timken Co. v. United States, 25 CIT 939, 944, 166 F. Supp. 2d 608, 616 (2001)).

### A. Surrogate Financial Ratio

Commerce selected Oil Country Tubular, Ltd. ("OCTL") as the only financial surrogate for DP-Master in both the Preliminary Determination and Final Determination. DP argues that Commerce should have averaged financial statements from OCTL with those from Jindal Saw, another Indian producer. DP's challenge is twofold: first, DP questions OCTL's suitability as a surrogate on the basis that it has a lower drill pipe production capacity, provides more services, and produces a wider variety of expensive goods than DP-Master; second, DP disputes Commerce's finding that Jindal Saw was too vertically integrated to be comparable to DP-Master. In essence, DP argues that OCTL is just as poor a match for DP-Master's production experience as Jindal saw, meaning that Commerce's decision to use only OCTL as a surrogate was unsupported by substantial evidence.

To account for factory overhead, SG&A, and profit in a nonmarket economy context, Commerce uses financial statements from "one or more surrogate companies." Fujian Lianfu Forestry Co. v.

United States, 33 CIT   ,   , 638 F. Supp. 2d 1325, 1353 (2009).
"To serve as an adequate proxy for the respondent companies being
reviewed, the surrogate companies selected ideally should produce
comparable merchandise" in the surrogate country.  Id. (citing 19
C.F.R. § 351.408(c)(4)).  In selecting an adequate proxy, "Commerce
'narrow[s] the list of financial statements meeting this criterion
by consider[ing] the quality and specificity of the statements,'"
Qingdao Sea-Line Trading Co. v. United States, 36 CIT   ,   , Slip
Op. 12-39 at 36 (Mar. 21, 2012) (citing Dorbest Ltd. v. United
States, 604 F.3d 1363, 1374 (Fed. Cir. 2010)), including whether
they show a comparable level of vertical integration.  Mittal Steel
Galati S.A. v. United States, 31 CIT 1121, 1139, 502 F. Supp. 2d
1295, 1311 (2007); see Air Prods. & Chems., Inc. v. United States,
22 CIT 1125, 31 F. Supp. 2d 999 (1998).  Although "Commerce
generally finds that the greatest number of financial statements
yields the most representative data from the relevant manufacturing
sector," Fujian Lianfu, 33 CIT at   , 638 F. Supp. 2d at 1353,
"Commerce is not justified in sacrificing quality for quantity."
Dorbest Ltd. v. United States, 30 CIT 1671, 1717, 462 F. Supp. 2d
1262, 1302 (2006).  As such, Commerce must avoid averaging
financial statements that would have an unjustifiably distortive
effect on the resulting surrogate financial ratio.  Id. at 1716-24,
462 F. Supp. 2d at 1301-08.

    The first prong of DP's argument focuses on differences

between OCTL and DP-Master.  DP argues that "OCTL's [oil tubular goods] production capacity vastly overshadows its drill pipe production capacity, which itself is only 1/10 of DP-Master's." Pls.' Br. at 30-31.  Commerce found that DP-Master and OCTL were at an "identical level of integration" because both "purchas[e] green tube that is then processed into drill pipe." I&D Memorandum at 22.  As DP argues elsewhere, oil tubular goods are comparable to drill pipe because the production of both requires modification of raw green tubes.  Pls.' Br. at 5-6, 13, 24, 32-33; CR 103 at 2-10 & Ex. 2.  Because the processes for producing drill pipe and oil tubular products are at least comparable, see 19 C.F.R. § 351.408(c)(4), DP's attempt to discredit OCTL's suitability on the basis that it has a lower capacity to produce drill pipe is unpersuasive.  DP also argues that "OCTL provides services, such as phosphating, plastic coating, reconditioning, and rethreading of drill pipe, and field inspection of tubulars," whereas "DP-Master outsources some [of those] services . . . and does not engage in any reconditioning, rethreading, or field inspection," and that "OCTL manufactures a much wider range of products[] than DP-Master," including many advanced and expensive specialty tools. Commerce recognized that OCTL offers many goods and services that DP-Master does not and that such production experience weighs against its viability as a surrogate.  I&D Memorandum at 22.

The second prong of DP's argument is that Commerce improperly

rejected Jindal Saw as a surrogate because it "does not appear to
be as fully-integrated as Commerce believed." Pls.' Br. at 32. DP
supports its argument with a quote from a Jindal Saw 2009-2010
annual report: "Jindal 'focused on value added production' and
reduced production of pig iron by 81.7% 'to [a] negligible level.'"
Pls.' Br. at 31 (quoting PR 218 at 29, 71) (alteration in Pls.'
Br.). This quotation is irrelevant for two reasons. First,
although pig iron is an input for some steel products, there is no
indication that Jindal Saw used its pig iron to make pipes.[8] See
PR 218 at 26-29. Second, contrary to DP's assertion, the annual
report shows that Jindal Saw's consumption of raw iron ore and iron
fines increased by 20% along with its production of pipes. PR 218
at 71. In other words, DP's selective quotation does not undermine
Commerce's finding that Jindal Saw is more vertically integrated
than DP-Master because it "begin[s] its production at the iron ore
stage." I&D Memorandum at 22.

        Furthermore, the same annual report demonstrates that Jindal
Saw produces "certain out of scope merchandise that [DP-Master]
does not," just like OCTL. See I&D Memorandum at 22. In addition
to non-drill pipe metal tube products, Jindal Saw "provides various

---

        [8] The annual report lists pig iron with other finished
products, not raw materials. PR 218 at 71. Furthermore, the
quoted 81.7% reduction in pig iron appears on a table labeled
"Company's sales mix" alongside sales of steel plates, steel coils,
and steel pipes. PR 218 at 29, 71. These facts imply that Jindal
produced pig iron for sale, not as an input for green tubes.

value added products like pipe coatings, bends and connector castings," PR 218 at 19, which DP does not claim to provide. Jindal Saw also produces and sells steel plates, steel coils, and pig iron, id. at 29, products DP does not claim to produce. Finally, Jindal Saw's wholly-owned subsidiary "owns and operates businesses in three core sectors of the Indian economy," none of which bear any relation to producing drill pipe or other oil extraction products: "Water, Waste Water and Solid Waste Management[;] Domestic Transportation & Logistics[; and] Transportation Equipment Fabrication." Id. at 8, 63-64, 89-90. Jindal Saw reaches as wide across as it does far down the stream of production, and as such it is equally subject to the criticism DP applies to OCTL.

Commerce's decision to use only OCTL as a financial surrogate is supported by substantial evidence in the record. OCTL and Jindal Saw both produce nonsubject goods, but Jindal Saw has a high level of vertical integration that neither DP-Master nor OCTL possess. On these facts, Commerce's choice not to average OCTL's data with distortive data from Jindal Saw was reasonable. Therefore, DP's request to remand for redetermination of the financial surrogate ratio must be denied.

### B. Surrogate Value for Drill Pipe Green Tube

In the Preliminary Determination, Commerce calculated a $1262.50 surrogate value for green tube by averaging prices and

offers for J/K-55 grade tube listed in the January and March 2009
issues of MBR.  As Commerce stated, "[MBR] is a widely respected
steel industry journal produced outside the context of this case .
. . [and] J/K55 is the most similar in yield strength to drill pipe
green tubes, a key characteristic in green tubes."  PR 186 at 7.
In the Final Determination, however, Commerce opted instead to use
average unit values of goods imported under IHTS categories 7304.29
and 7304.23 to calculate a $2,511.67 surrogate value.  I&D
Memorandum at 31-32.  One of the reasons Commerce changed its mind
was that, in its opinion, the IHTS categories actually "capture"
green tube, whereas the MBR issues described J/K-55 grade tube, a
product "that is only comparable to" green tube.[9]  Id.  DP contends
that Infodrive India listings for IHTS categories 7304.29 and
7304.23 show that imports under both categories were actually
devoid of green tube and dominated by high-priced finished
products, meaning that Commerce did not base its determination on
substantial evidence.[10]  Pls.' Br. at 15-17.

_____

[9] Commerce also rejected the MBR data as derived from a time
frame "so isolated . . . as to be potentially subject to temporary
market fluctuations" and listing mere "offers for sale," whereas
the IHTS categories are transaction prices "fully contemporaneous
with the POI [representing] broad market average prices in India
during the entire POI."  Id. at 31-32.

[10] DP also alleges that Commerce issued its determination
contrary to law because "Commerce . . . based its green-tube SV
determination on a limitation that only HTS categories could be
considered for selection as SV."  Pls.' Br. at 17.  Nothing in the
Final Determination suggests that Commerce rejected DP-Master's
proposed surrogates solely because they were not IHTS categories.

     This Court has recognized Infodrive's utility in specifying descriptions of products at the moment of import as a supplement to aggregated IHTS data.  See Dorbest Ltd., 30 CIT at 1695-98, 462 F. Supp. 2d at 1284-86 (2006); Zhejiang, 652 F.3d at 1342.  Infodrive is not a perfect tool, Zhejiang, 652 F.3d at 1342, and so Commerce need not rely on Infodrive data that is incomplete or demonstrably inaccurate.  Globe Metallurgical, Inc. v. United States, 33 CIT   , __ , Slip Op. 09-37 at 7-8 (May 5, 2009), appeal dismissed per stipulation, 449 Fed. App'x 9 (Fed. Cir. 2010); Calgon Carbon Corp. v. United States, 35 CIT   , __ , Slip Op. 11-21 at 17 (Feb. 17, 2011).  Nevertheless, this Court has consistently found that Commerce is obliged to address Infodrive data offered in rebuttal if it specifies a "definite and substantial percentage" of imports under a particular IHTS category.  Calgon Carbon, 33 CIT at   , Slip Op. 11-21 at 17; see Zhengzhou Harmoni Spice Co. v. United States, 33 CIT   , __ , 617 F. Supp. 2d 1281, 1325 (2009); Longkou Haimeng Mach. Co. v. United States, 32 CIT 1142, 1162-65, 581 F. Supp. 2d 1344, 1361-64 (2008).

     In the Final Determination, Commerce admitted that the Infodrive data was substantially complete and an accurate

---

DP's confusion may be a result of Commerce's justification for describing IHTS categories 7309.23 and 7309.29 as more product specific than other Indian HTS data.  See I&D Memorandum at 31 ("[DP-Master] has placed no evidence on the record demonstrating that a different HTS category is more appropriate for green tubes . . . ." (emphasis added)).

representation of imports under IHTS category 8431.43.90 in the context of explaining its selected surrogate value for tool joints. I&D Memorandum at 26.  When it evaluated the Infodrive data with respect to green tube, however, Commerce dismissed DP-Master's argument in one sentence: "Infodrive data placed on the record by [DP-Master] definitively show entries of green tube under . . . categories [7309.23 and 7309.29]." I&D Memorandum at 31.  Although DP-Master argued "that these [IHTS] categories are 'overwhelmed' by products further along in the production process than raw green tube," Commerce found that they were not "necessarily unrepresentative of the input" and were in fact "product-specific to the green tubes used in the production of drill pipe." Id.  In response to the instant motion, Commerce reiterates its position: "While J/K 55 demonstrably cannot be used to make drill pipe, the basket categories did, in fact contain prices for the green tube at issue." Def.'s Br. at 19.  Put simply, Commerce found that because IHTS averages actually "captured" green tube, as demonstrated by the Infodrive data, it was the best available surrogate value. See I&D Memorandum at 31–32.

Commerce's description of the Infodrive data in the Final Determination is misleading to the point where it is impossible to determine whether its reliance on the IHTS data was reasonable. See Calgon Carbon, 33 CIT at   , Slip Op. 11-21 at 17–19.  Commerce determined that the IHTS data was a reasonable surrogate because

the Infodrive listings "definitively show entries of green tube,"

I&D Memorandum at 31, but of the hundreds of entries listed on the

Infodrive tables, only three might be properly categorized as

"definitively" green tube: two 9/9/09 entries describing "RAW-PIPE

SEAMLESS" and "RAW - TBG SEAMLESS" and one 9/5/09 entry describing

"RAW-PIPESEAMLESS." See PR 162 Ex. SV-45 (tables for imports under

7304.23.90 at page 4).  DP argues that there are no entries for

green tube, Pls.' Br. at 16, and indeed these three entries are

also described as being "WALL MATERIAL," implying that they may be

unsuitable for the production of drill pipe.  See PR 162 Ex. SV-45

(tables for imports under 7304.23.90 at page 4).  Neither party

thoroughly explains the other entries for "seamless pipe"[11] at

present, but DP-Master did submit a detailed analysis of the

Infodrive data below tending to show that there are in fact no

green tube entries.  See PR 162 at 7-17.  DP-Master corroborated

its interpretation below with evidence indicating that Indian green

tube imports would be low during the period of investigation

because of "measures taken [in late 2008] by the Indian

_____

[11] The record establishes a distinction between raw seamless
green tube on the one hand, and finished seamless tubing on the
other. CR 98 2-9 & Att. 1; CR 103 at 2-10. Given the unspecific
descriptions for tube entries and the absence of entries for green
tube suitable for drill pipe, the Infodrive listings are, at a
minimum, ambiguous as to what kinds of pipes and tubes actually
entered India under categories 7309.23 and 7309.29. See PR 162 Ex.
SV-45. Even the most generous interpretation of the Infodrive data
cannot support Commerce's explicit finding that the data
"definitively show entries of green tube." I&D Memorandum at 31.

government[] to restrict imports [of green tube] . . . from low-price producers in China."  PR 138 Ex. 3 at 10.  Commerce did not address this evidence in the <u>Final Determination</u>.

Defendant-intervenors argue that the IHTS data is accurate because the finished casing and tubes actually imported under those categories are comparable to drill pipe green tube.  Intervenor-Def.'s Mem. Opp'n Pls.' Br. ("Intervenor-Def.'s Br.") at 5-8. Specifically, "while the [IHTS] categories selected by Commerce may include products more fully advanced than green tube, these categories also include OCTG casing and tubing that have less demanding performance characteristics and may be produced from less expensive materials using less expensive processing than green tube for drill pipe."  Intervenor-Def.'s Br. at 7.  As DP correctly points out, Pls.' Reply at 3 n.2, Commerce hints at this same argument in its response to the instant motion: "[A]fter identifying green tube within the Indian customs data, Commerce determined that the data was <u>sufficiently</u> product specific." Def.'s Br. at 19 (emphasis added).  In the <u>Final Determination</u>, however, Commerce explicitly rejected MBR data for J/K-55 tubing because J/K-55 is "a product that the record demonstrates cannot be used to produce drill pipe."  <u>I&D Memorandum</u> at 31.  Both J/K-55 tubing and the IHTS 7309.23 and 7309.29 imports are comparable to drill pipe green tube, and both J/K-55 and the IHTS 7309.23 and 7309.29 imports cannot be used to produce drill pipe.

Consequently, if Commerce meant to say in the <u>Final Determination</u> that the IHTS categories were product specific because they captured <u>related</u> goods, then it did not adequately describe why it dismissed the MBR data. Defendant-intervenors cannot use the benefit of hindsight to justify the <u>Final Determination</u> with an analysis Commerce demonstrably could not have relied upon below.

Commerce's rebuttal of each of DP's four alternative surrogates[12] in response to the instant motion does not cure its inadequate explanation of its reliance upon the IHTS data. <u>See</u> <u>Longkou Haimeng</u>, 32 CIT at   , 581 F. Supp. 2d at 1363-64. Although Commerce is not required to address every counterargument or piece of evidence before it, <u>see</u> <u>Taian Ziyang Food Co. v. United States</u>, 33 CIT   ,   , 637 F. Supp. 2d 1093, 1141 (2009), its failure here to explain evidence apparently contrary to a finding central to its determination leaves the court without the means necessary to affirm it as supported by the record. <u>See</u> <u>Taian Ziyang Food Co. v. United States</u>, 35 CIT   ,   , 783 F. Supp. 2d

---

[12] DP's four alternatives are as follows: First, and what DP characterizes as "possibly the best viable alternative," are May 2009 MBR descriptions of "prices" and "offers" for Indian seamless OCTG. Second, DP offers the January and March 2009 Indian prices and offers for J/K-55 that Commerce used in the <u>Preliminary Determination</u> with a deflation adjustment "to account for [downward] global pricing trends." Third, DP constructs a value by taking the cost of alloy billets and adding proprietary amounts representing the cost of processing billets into green tube. Lastly, given "that drill pipe green tube is always seamless," DP suggests averaging Indian prices for seamless tube and adding a proprietary adjustment for chemistry. Pls.' Br. at 19-20.

1292, 1331-32 (2011) (remand appropriate where there remained "serious unanswered questions" as to Commerce's justification for selecting apparently distorted import statistics as the best available surrogate).  On remand, Commerce is not barred from selecting the IHTS data — it need only explain why such data is more representative of the price for drill pipe green tube than other potential surrogate values in light of Infodrive data that appears to demonstrate that categories 7309.23 and 7309.29 do not actually "capture" green tube and are highly distorted by expensive, finished tubular goods.

### C. Surrogate Value for Purchased Tool Joints

Commerce used average unit values of imports under IHTS 8431.43.90 to calculate the tool joint surrogate value in the Preliminary Determination.  DP-Master objected, offering two alternatives: "petitioners' actual experience . . . even though it is non-public and from the [U.S.]," and a value "that could be calculated from the [factors of production] information DP-Master submitted on the record prior to the preliminary determination . . . [that] would have reflected commercial reality." PR 191 at 8-10.  Commerce chose the latter in the Final Determination, adding "surrogate ratios for overhead, SG&A, and profit . . . to as closely as possible approximate the experience of purchasing [tool joints] from an unaffiliated supplier." I&D Memorandum at 28.  DP now contends that it was unreasonable for Commerce to have chosen

this surrogate valuation method because petitioners' tool joint data was in fact the best available information, and because the chosen $10,529.40 surrogate value is much higher than the $5571.40 value selected for tool joints DP-Master produced in-house and the comparably priced proprietary value of tool joints petitioners purchased in the U.S. Pls.' Reply at 9-10.

Commerce acted reasonably when it declined to use petitioners' data as the best available information on the record. See QVD Food Co., 34 CIT at    , 721 F. Supp. 2d at 1315 (citing Goldlink, 30 CIT at 619, 431 F. Supp. 2d at 1327). DP admits that petitioners' prices are derived from U.S. market prices and that the U.S. market is not economically comparable to the PRC, Pls.' Br. at 25-26, and it does not dispute that the chosen surrogate value is derived entirely from the primary surrogate country, India. I&D Memorandum at 28. DP also admits that petitioners' data is proprietary, whereas the chosen surrogate is based on public information. Pls.' Br. at 25-26. DP argues at great length that petitioners' prices are a "precise product match" for the tool joints DP-Master purchased, e.g., Pls.' Br. at 25, but it does not contest that the chosen surrogate value is also product specific.[13] See id. at

---

[13] The most direct argument DP makes challenging product specificity has no basis in the law. DP argues that "because the [chosen surrogate] is not a value for tool joints at all, but rather is based upon the sum of values of other products," Commerce ignored "the statutory requirement to 'determine the normal value of the subject merchandise on the basis of the factors of production utilized in producing the merchandise.'" Pls.' Br. at

24-29; I&D Memorandum at 27-28.  Faced with a choice between two
product-specific surrogate valuation methods spanning the period of
investigation, this court cannot say that Commerce erred when it
selected the method that was based on public data from the primary
surrogate country over proprietary data from a country not
economically comparable to the U.S.  See Goldlink, 30 CIT at 619,
431 F. Supp. 2d at 1327 ("[T]he Court must defer to Commerce" if
its determination below is reasonable.).

     DP employs a false comparison of the $10,529.40 surrogate
value with the $5571.40 constructed value for the tool joints it
produces to raise doubts about Commerce's choice.  The $5571.40
tool  joint  value  lacks  the  profit,  SG&A,  and  overhead
considerations that would be reflected in the price of tool joints
offered for sale in a surrogate market, and so $5571.40 is not an
accurate representation of purchased tool joint value.  See I&D
Memorandum at 28.  Furthermore, given the nature of the tool joint
market, the record shows that the chosen surrogate value is not
aberrational when compared to the proprietary average value of tool
joints purchased in the U.S.  The parties agree that tool joints
are highly specialized and expensive components that are not

---

29.  However, this Court has held that "assigning a surrogate value
to the factors of production going into the production of . . .
intermediate inputs" when valuing those intermediate inputs is in
fact consistent with the law.  Anshan Iron & Steel Co. v. United
States, 27 CIT 1234, 1238-41 (2003) (not published in the Federal
Supplement).

comparable to other kinds of pipe fittings.  See I&D Memorandum at 26-27.  Tool joints are only produced "in a few countries," none of which are market economies comparable to the PRC.  I&D Memorandum at 28.  Because tool joints are so specialized and because there are so few tool joint producers in the world, it was reasonable for Commerce to accept variation among potential surrogate values, especially when comparing normalized prices in a developing nonmarket economy to actual prices in an advanced market economy.

"[T]he process of constructing foreign market value for a producer in a nonmarket economy country is difficult and necessarily imprecise."  Nation Ford Chem., 166 F.3d at 1377 (quoting Sigma, 117 F.3d at 1407).  That DP also presents a well-reasoned case for why Commerce could have chosen petitioners' data as the best available does not change the fact that this court cannot usurp Commerce's sound judgment in selecting a different viable surrogate.  See Peer Bearing Co. v. United States 25 CIT 1199, 1201-02, 182 F. Supp. 2d 1285, 1292 (2001).  Because Commerce's choice here was reasonable, DP's challenge must fail.  See Goldlink, 30 CIT at 619, 431 F. Supp. 2d at 1327.

### D. Surrogate Value for Labor

DP argues that, when calculating the labor wage rate surrogate value, Commerce averaged the wage rate of thirty-one countries that produced comparable merchandise without distinguishing between producers and "significant producers" as required under 19 U.S.C.

§ 1677b(c)(4)(B).  As a result, Commerce included low-producing countries in the surrogate wage rate average like Swaziland, even though it only exported $469 worth of comparable merchandise. Commerce concedes that it should reconsider its labor wage rate determination in light of <u>Shandong Rongxin Import and Export Co. v. United States</u>, 35 CIT  ,  , 774 F. Supp. 2d 1307, 1315–16 (2011). Accordingly, DP's request to remand for reconsideration of the surrogate labor wage rate is granted.

### III. Partial Application of Adverse Facts Available

DP argues that "Commerce's application of adverse facts available . . . because of an independent toller's failure to report certain information regarding consumption of material inputs is unsupported by substantial evidence and is contrary to law." Pls.' Br. at 35.  Under 19 U.S.C. § 1677e(b), Commerce may apply an adverse inference when a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information." <u>Id.</u>  "Failure to cooperate" is evaluated under an objective and subjective standard.  <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  First, Commerce must show that "a reasonable and responsible [party] would have known that the requested information was required to be kept and maintained under the applicable statues, rules and regulations," and second, "that the respondent under investigation . . . either: (a) fail[ed] to keep and maintain all required records, or (b)

fail[ed] to put forth its maximum efforts to investigate and obtain the requested information from its records." Id. at 1382–83; Ad Hoc Shrimp, 33 CIT at   , 637 F. Supp. 2d at 1304.

Commerce relied on DP-Master's failures in deciding to apply an adverse inference, not its toller's poor recordkeeping.[14] I&D Memorandum at 47. On April 7, 2010, Commerce instructed DP-Master to provide "a detailed explanation of all efforts undertaken to report the actual quantity of each [factor of production]" if it could not report its toller's actual consumption. I&D Memorandum at 47 (citing PR 53 at G-1 to G-5 & §§ C, D). DP-Master provided information that was not based on its toller's actual consumption, but it failed to offer any explanation until verification. PR 226 at 2. DP-Master was also instructed to inform Commerce "immediately" if it would not be able to assemble materials required for verification of its responses due to a recalcitrant third party. I&D Memorandum at 47; PR 53 at G-1. DP-Master provided information but failed to notify Commerce that it was unable to assemble documents required for verification. Id. At verification, DP-Master revealed "for the first time" that it

---

[14] Commerce did use the toller's inadequate recordkeeping as a basis to apply facts otherwise available. I&D Memorandum at 45. DP does not contest this aspect of Commerce's determination. See Pls.' Br. at 35–36; Pls.' Reply at 11–13; Nippon, 337 F.3d at 1831 ("The mere failure of a respondent to furnish requested information — for any reason — requires Commerce to resort to other sources of information to complete the factual record upon which it makes its determination." (emphasis added)).

neither provided information in the manner requested nor assembled records necessary for verification of that information. Id. at 45.

DP-Master's actions — lulling Commerce into believing it had provided information in the manner requested when it in fact had not, and then suddenly admitting that it had not provided reliable information at verification — are closer to the kind of "deliberate concealment or inaccurate reporting" that "surely evince[] a failure to cooperate" than to the mere "inadequate inquiries" sufficient for application of an adverse inference. See Nippon, 337 F.3d at 1383 (emphasis added). Although DP-Master notified Commerce that it was having difficulty securing information from its toller, DP does not and cannot dispute that Commerce provided "extensive instructions . . . numerous times over the course of the investigation" to the effect that DP-Master should notify Commerce if it was unable to provide information in the manner requested. I&D Memorandum at 47; Wuhan Bee Healthy Co. v. United States, 31 CIT 1182, 1191 (2007) (not published in the Federal Supplement) (objective prong satisfied where "a reasonable and responsible respondent would have brought any problems surrounding its supporting documentation to Commerce's attention before the verification"). DP also does not and cannot dispute that DP-Master failed to provide a detailed explanation of its efforts to get actual-consumption data before verification as requested. See Sidenor Indus. SL v. United States, 33 CIT    ,    , 664 F. Supp. 2d

1349, 1358 (2009) (subjective prong satisfied where respondent failed to act as requested even though it was able to do so).

The record belies DP's contention that it is "not the party who failed to cooperate," Pls.' Br. at 35 (emphasis omitted), and so this court cannot say that the application of an adverse inference to DP-Master's unverifiable submissions was unreasonable or contrary to law.[15] Wuhan Bee, 31 CIT at 1191-93. DP-Master's inability to acquire trustworthy information cannot serve as an excuse for its failure to notify Commerce as requested. See Nippon, 337 F.3d at 1382-83; Wuhan Bee, 31 CIT at 1191-93. Consequently, Commerce acted reasonably and in accordance with the law when it applied an adverse inference to the information it could not verify.

---

[15] DP offers two additional arguments that have no bearing on Commerce's determination below. First, DP suggests that an adverse inference is inappropriate because it otherwise provided verifiable information "with only minor discrepancies." Pls.' Br. at 36. Commerce, however, applied an adverse inference "only . . . to the portion of [DP-Master's] response dealing with its phosphate treatment toller's factors [of production]," I&D Memorandum at 47, and so DP-Master's cooperation during the rest of the investigation is irrelevant. Second, DP asserts in its reply that "Commerce only cites to its own threats regarding cooperation and [adverse facts available], but it does not . . . cite to any record information indicating how [DP-Master] was uncooperative in any way." Pls.' Reply at 13. Given that Commerce found that DP-Master failed to provide a "detailed explanation of all efforts undertaken to report the actual quantity of each [factor of production]" its toller consumed, I&D Memorandum at 47, it is no surprise that Commerce would be unable to locate and cite such a document in the record. In any event, DP's argument does not deter from the fact that Commerce explained its decision with ample citations to the record. See id. at 44-47; Nippon, 337 F.3d at 1382-83.

## IV. Simultaneous Application of Nonmarket Economy Methodology and Countervailing Duty Law

DP's motion — dated February 8, 2012 — argues for remand on the basis of the Federal Circuit's decision in <u>GPX International Tire Corp.</u>, 666 F.3d at 734.  That decision invalidated Commerce's simultaneous application of countervailing duty law and nonmarket economy methodologies below, which was its usual approach under then-existing law.  The Federal Circuit decided <u>GPX</u> on December 19, 2011, almost a year after DP appealed the <u>Final Determination</u> to this court.  <u>Id.</u>  Just over a month after DP filed the instant motion, Congress passed Public Law 112-99, amending the Tariff Act of 1930.  126 Stat. 265.  Public Law 112-99 clarifies that "merchandise on which countervailing duties shall be imposed . . . includes a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the [U.S.] from a nonmarket economy."  19 U.S.C. § 1671(f)(1).  On deciding a motion to rehear the case, the Federal Circuit recognized that with the passage of Public Law 112-99, "Congress clearly sought to overrule . . . <u>GPX</u>."  <u>GPX Int'l Tire Corp. v. United States</u>, 678 F.3d 1308, 1311 (Fed. Cir. 2012).  Accordingly, the Federal Circuit held that "the statute prior to the enactment of the new legislation did not impose a restriction on Commerce's imposition of countervailing duties on goods imported by [nonmarket economy] countries to account for double counting."  <u>Id.</u> at 1312.

Recognizing that Public Law 112-99 "permits Commerce to apply

[countervailing duties] concurrently with the [nonmarket economy] methodology," DP argues for the first time in its reply that Public Law 112-99 is unconstitutional because it violates DP's equal protection, due process, and ex post facto rights and that "the law may have other constitutional infirmities." Pls.' Reply at 14-15. "Arguments raised for the first time in a reply brief are not properly before this court," United States v. Ford Motor Co., 463 F.3d 1267, 1276-77 (Fed. Cir. 2006), and such arguments are usually deemed to be waived. Novosteel SA v. United States, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002); see Ford Motor Co., 463 F.3d at 1276-77. Here, however, DP did not have an opportunity to present its constitutional objections before it filed its reply because Public Law 112-99 did not become effective until March 13, 2012 — well after it filed the instant motion.  DP's good faith effort to preserve its objections is dissimilar from other parties' failure in previous cases to present arguments available to them at the time of filing the main brief, and therefore, waiver is inappropriate. See Novosteel SA, 284 F.3d at 1273-74; Ford Motor Co., 463 F.3d at 1276-77.

A more fundamental concern is that Commerce and domestic industry have not yet been afforded a full opportunity to be heard. The unique circumstances of this case may deem the application of waiver inappropriate, but it is impossible at present for the court to address the important constitutional issues briefed only in two

short paragraphs in DP's reply.  Indeed, beyond challenging the substance of DP's arguments, Commerce or domestic industry may justifiably raise concerns about standing, mootness or estoppel. Therefore, DP's request for a remand on its due process, equal protection, and ex post facto objections is denied without prejudice to renew after Commerce returns with its remand determination.

## CONCLUSION

For the foregoing reasons, the court concludes that the <u>Final Determination</u> is in accord with the law and is supported by substantial evidence, except with respect to Commerce's explanation of its findings regarding the surrogate value for drill pipe green tube and to its findings regarding the surrogate labor wage rate as applied to DP-Master.  On remand, Commerce must either select a new surrogate value or explain why IHTS categories 7309.23 and 7309.29 are more representative of the price for drill pipe green tube than other potential surrogate values in light of Infodrive data that appears to demonstrate that the categories do not actually "capture" green tube imports, and are highly distorted by expensive, finished tubular goods.  This court also reserves judgment on any constitutional issues until after Commerce returns with its remand results.

## ORDER

In accordance with the above, it is hereby

**ORDERED** that this case is remanded to the United States Department of Commerce, International Trade Administration, to reconsider its findings regarding drill pipe green tube and labor wage rate surrogate values; and it is further

**ORDERED** that the <u>Final Determination</u> is affirmed in all other respects; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date this opinion is entered.  Any responses or comments are due within thirty (30) days thereafter.  Any rebuttal comments are due within fifteen (15) days after the date responses or comments are due.


　　　　　　　　　　　　　　   /s/ NICHOLAS TSOUCALAS   
　　　　　　　　　　　　　　　　**Nicholas Tsoucalas**
　　　　　　　　　　　　　　　　**Senior Judge**


**Dated: November 20, 2012**
**　　　　New York, New York**